**2025 IL 131420**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 131420)

KEVIN HAASE *et al.*, Appellees, v. KANKAKEE SCHOOL
DISTRICT 111 *et al.*, Appellants.

*Opinion filed November 20, 2025.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Theis, Overstreet, Holder White, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1 At issue in this appeal is whether a school district and its employee were entitled to immunity under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2016)) in an action filed by a student who was injured during gym class. The circuit court of Kankakee County entered an order granting summary judgment to the defendants,

Kankakee School District 111 (District) and its employee, Darren Wilbur Dayhoff. The court concluded that the defendants were immune from liability pursuant to sections 2-109, 2-201, and 3-108 of the Tort Immunity Act (*id.* §§ 2-109, 2-201, 3-108). The appellate court reversed the circuit court's judgment. 2024 IL App (3d) 230369-U. For the reasons that follow, we reverse the appellate court's judgment and affirm the circuit court's grant of summary judgment for the defendants.

¶ 2                                   BACKGROUND

¶ 3        On February 16, 2018, Kevin Haase (Kevin), individually and as parent and next friend of Riley Haase (Riley), a student of Kankakee School District 111, filed a complaint in the circuit court of Kankakee County against the District and Dayhoff. Dayhoff was a teacher working in the District. On September 12, 2022, Kevin and Riley, who had reached the age of majority by that date and was now also a named plaintiff, filed a two-count, second amended complaint against the District and Dayhoff. Count I alleged willful and wanton conduct. It alleged that on March 13, 2017, Riley was a student in seventh grade at Kankakee Junior High School. On that date, at approximately 10:45 a.m., Riley was in his gym class playing soccer with other students. Dayhoff was a physical education teacher whose job was to teach and supervise the students during gym class.

¶ 4        Count I alleged that, shortly after the class began, Dayhoff "provided soccer balls to the students, went to a seat in the corner of the gym, put his feet up, and began using his cellphone and/or a computer." It alleged that Dayhoff knew that another student in the class, referred to in the complaint as "Student A," "had a history of physically violent behavior towards other students and required an increased amount of supervision for the benefit and safety of other students." The second amended complaint alleged that Student A "had been disciplined in the past for physically violent behavior, including fighting, battery, and unwanted physical aggression with other students."

¶ 5        Count I further alleged that, during the soccer game, Student A "began to initiate unwanted physical contact between himself and other students playing soccer, committing prohibited battery and physical aggression, in a manner that had no connection to otherwise incidental contact between students playing the game."

It alleged that Student A "tackled [Riley], causing him to fall and severely injure his arm, resulting in paralysis of the arm and permanent injury."

¶ 6    Count I alleged that the District was liable for the actions or omissions of its employee and/or agent, Dayhoff. Nowhere in the second amended complaint did it allege that the District's own actions or omissions breached its duty of care.

¶ 7    Paragraph 22 of count I alleged that the District, through its employee and/or agent Dayhoff, and Dayhoff, individually, breached their duty of reasonable care, were utterly indifferent, and/or consciously disregarded the safety of the students, including Riley, in the following manner:

"a. Defendant, DAYHOFF, failed to stop or remove 'STUDENT A' from the aforesaid soccer game when it was clear the student was engaged in a dangerous course of conduct of physical aggression and battery towards other students that would cause foreseeable harm if not stopped;

b. Defendant, DAYHOFF, failed to engage in supervision of his class and, specifically, 'STUDENT A,' when he knew or should have known that his failure to supervise the students and intervene and/or prevent a course of conduct of battery and physical aggression would cause harm to other students;

c. Defendant, DAYHOFF, knew or should have reasonably known that 'STUDENT A' was engaged in a course of conduct of physical aggression and battery towards other students and did nothing to stop it when it would foreseeably cause harm;

d. Defendant, DAYHOFF, knew of a course of conduct by 'STUDENT A' but consciously disregarded it and continued to use his phone and/or computer and sit in the corner and failed to take any steps to stop the aforementioned conduct when it was foreseeably likely to lead to injury of another student."

¶ 8    Count II of the second amended complaint incorporated the allegations pled in count I and alleged that Kevin was obligated to pay the medical expenses of his minor son, Riley. Count II sought damages under the family expense provision of the Rights of Married Persons Act (750 ILCS 65/0.01 (West 2016)), a provision commonly referred to as the Family Expense Act (see *id.* § 15(a)(1)).

¶ 9        The defendants filed a motion for summary judgment. In their motion, they asserted that they were entitled to complete immunity for both negligence and willful and wanton conduct under sections 2-109 and 2-201 of the Tort Immunity Act. See 745 ILCS 10/2-109 (West 2016) (immunizing a local public entity from liability for an injury resulting from an act or omission of its employee where the employee is not liable); *id.* § 2-201 (immunizing a public employee from liability for an injury resulting from the employee's act or omission in determining policy when acting in the exercise of discretion). Alternatively, the defendants asserted that they were entitled to immunity from liability for negligent supervision because the plaintiffs failed to allege willful and wanton conduct. See *id.* § 3-108 (providing immunity for negligent supervision of an activity on public property unless the conduct amounts to willful and wanton conduct). The defendants also asserted that count II of the second amended complaint failed to state a valid cause of action under the Family Expense Act.

¶ 10       The following facts are taken from the evidentiary materials attached to the defendants' summary judgment motion and the plaintiffs' response. In his deposition, Riley testified that during the gym class on March 13, 2017, after Dayhoff took attendance and the students completed their warmup exercises, Dayhoff provided soccer balls and basketballs to the students. Dayhoff then sat in a chair in a corner of the gym, put his feet up on a wheeled cart, and opened his laptop. According to Riley, Dayhoff would sit in a chair and look at his laptop or his phone "every day" during gym class.

¶ 11       Riley testified that he chose to play soccer with approximately 8 to 10 other students, while the rest of the class played basketball on the other side of the gym. The corner where Dayhoff was sitting was closer to the basketball game than the soccer game. According to Riley's testimony, the students chose the teams for the soccer game, and Student A was not on either team. About four minutes into the game, Student A began "running in and trying to grab the ball" from the students who were playing soccer. Riley explained that "whoever was kicking the ball to score a goal for the game, [Student A] would run up and try to push them for the ball." This happened "probably" three times. Riley also remembered seeing Student A "messing around" with students who were not dressed for gym class and were sitting against the wall.

¶ 12    Toward the end of class, Riley went to pick up a soccer ball that had been kicked out of bounds. Riley had no memory of what occurred immediately after picking up the ball. He next remembered his friend, Jacob Gilreath, helping him walk over to Dayhoff. Riley was crying, and his head and arm were hurting. Jacob told Dayhoff that Student A had tackled Riley into a wall. Prior to March 13, Riley had not had problems with Student A in gym class or in school. Riley testified that he did not think Student A "personally targeted" him. He thought that Student A was "messing around too much." Riley testified that he sustained severe injuries from the incident and continued to suffer from pain and other symptoms that prevented him from playing sports.

¶ 13    Jacob testified that during the gym class on March 13, 2017, Student A was running in and out of the soccer game. He stated that Student A was playing soccer aggressively and being "unnecessarily rough." Jacob observed Student A pushing other students with his body and kicking the soccer ball "unnecessarily hard." Jacob testified that he did not report Student A's behavior because he "didn't really think much of it" and it "didn't harm me in any way." Jacob gave the following answers in his deposition:

"Q. Prior to Riley hitting the wall, did you see him make contact with Riley at all?

A. Other than trying to get the ball from him or, like, something like that.

Q. In a way that you would typically expect when someone's playing soccer?

A. Yeah."

Jacob testified that he looked over at Dayhoff "once or twice" while he was playing soccer and he saw Dayhoff looking at his laptop.

¶ 14    Dayhoff testified that March 13, 2017, was a "recreational game day" for the seventh grade boys' class, which included about 30 students. The students changed into their uniforms, did warmup exercises, and then split into two groups to play soccer or basketball. Dayhoff denied the complaint's allegation that he was sitting down in the corner during the entire gym class. He stated that he was observing both groups of students from a corner of the gym and periodically walking around

- 5 -

the gym to supervise the games. Dayhoff did not recall whether he was using his cell phone or computer during the class.

¶ 15 Dayhoff testified that he allowed Student A to play soccer, even though Student A was not dressed in his gym uniform. Dayhoff stated that he did not see Student A engaging in aggressive behavior or initiating unwanted physical conduct with other students. He recalled that Student A was "playing soccer just like the rest of them." Dayhoff testified that, if he had observed Student A engaging in aggressive or unwanted physical behavior, he would have removed him from the game and possibly imposed other consequences.

¶ 16 Dayhoff testified that he saw the incident at issue "from a distance." He observed "three or four kids battling for the ball," including Riley and Student A. He testified that he did not see exactly what happened after that. However, he testified that "Riley ended up on the floor and then that's when they—that's when another student brought him to me because he was complaining that his arm hurt." Dayhoff testified as follows:

> "Q. Am I correct then to your observation from what you saw this was a normal scrum for a soccer ball and Riley fell down?
>
> A. Yes.
>
> Q. And you did not see Student A do anything out of the ordinary beyond trying to get a soccer ball, correct?
>
> A. No, I did not yet. Yes."

¶ 17 Dayhoff testified that he did not recall sending Student A to the office for any reason during the 2016-17 school year. He did not recall having any disciplinary problems with Student A throughout the school year, other than Student A sometimes "goofing around," not dressing for class, or not participating in class. Dayhoff expressly denied the complaint's allegation that he "knew that [Student A] had a history of physically violent behavior towards other students." Dayhoff testified that he had never received a warning, note, or letter from the school administration or staff about Student A's disciplinary history, and he had never looked at Student A's disciplinary history on the school's computer system.

¶ 18    Charles Hensley, the principal, testified that the incident on March 13, 2017, was deemed an accident. Hensley did not remember whether the administration considered Student A to be physically aggressive or a person who got into fights. Hensley testified that there was no policy requiring teachers to review or monitor the school computer system for a student's behavioral reports or disciplinary history.

¶ 19    Fiona Walz was the assistant principal who was responsible for student discipline for the seventh grade. She explained the procedure for disciplinary referrals. A teacher or staff member would write a referral for a student who violated the school's code of conduct, and Walz would determine the appropriate disciplinary measures for that student. Walz testified that Student A had received some referrals, but she did not remember the details. During the 2016-17 school year, she communicated to the school staff that Student A needed increased supervision for his wandering. Walz did not inform any school staff member that Student A had a history of physical aggression because she did not believe he was physically aggressive. According to Walz, there was no school policy requiring a school administrator to inform teachers of a particular student's behavior or discipline; rather, that decision was made on an individual basis.

¶ 20    Sarah Lenfield, the school counselor, testified that she had worked with Student A on his issues with peer relationships and socialization. She did not believe he was physically aggressive. Lenfield testified that Student A was involved in some fights but that he was not prone to initiating fights and was often the target. Lenfield testified that she did not receive any notification or request from a teacher regarding Student A's physical aggression.

¶ 21    Student A's disciplinary record for the 2016-17 school year indicated that he received 29 referrals from August 2016 to March 2017. Of those referrals, three were for physical aggression, and four were for fighting. The remaining referrals were for cutting class, being in an unauthorized area, insubordination, and use of profanity. Five of the seven referrals for physical aggression or fighting occurred in the first half of the school year.

¶ 22    On July 24, 2023, the circuit court entered an order granting summary judgment for the defendants. In a memorandum opinion, the circuit court held that the defendants were immune from liability under sections 2-109 and 2-201 of the Tort

Immunity Act. 745 ILCS 10/2-109, 2-201 (West 2016). The court held that Dayhoff's decisions with respect to his supervision of gym class on the date of the incident, including his decisions to allow a recreational game day, to allow Student A to participate in the soccer game, and to refrain from interceding in the soccer game, involved both the exercise of his discretion and a determination of policy within the meaning of section 2-201.

¶ 23　　The circuit court also found that the allegations in the second amended complaint were not sufficient to state a cause of action for willful and wanton conduct. The court concluded that the facts established, at most, inadvertence and inattentiveness by Dayhoff, which were insufficient to establish willful and wanton conduct under Illinois law. Thus, even if section 2-201 immunity did not apply, section 3-108 of the Tort Immunity Act immunized the defendants from liability for injuries resulting from negligent supervision. Finally, the court found that the Family Expense Act did not apply as a matter of law.

¶ 24　　A divided appellate court panel reversed the circuit court's judgment and remanded the case to that court for further proceedings. 2024 IL App (3d) 230369-U. The majority first held that section 2-201 of the Tort Immunity Act did not entitle the defendants to summary judgment because there was a disputed issue of fact as to whether Dayhoff made a conscious discretionary decision or policy determination. *Id.* ¶¶ 26-27. With respect to section 3-108, the majority concluded that the District's knowledge of Student A's disciplinary history and its failure to inform teachers of that history were genuine issues of material fact that precluded summary judgment. *Id.* ¶ 31. The majority reasoned as follows:

　　"We do not reach a decision whether section 3-108 applies instead of section 2-201. We only find due to the disputed material facts, the court improperly granted summary judgment. Here, there are numerous facts in dispute regarding Student A and defendants' actions or inactions. In particular, Student A's reputation and level of aggression are disputed. Riley and Jacob both said they knew Student A was aggressive before this incident and he got into fights. But Walz and Lenfield said he was not aggressive or the initiator, but more so a target. The only communications about Student A that Walz sent to teachers were about his tendencies to wander, and Lenfield never received concerns from teachers that Student A exhibited aggressive behavior. However,

Student A's disciplinary record for part of the 2016-2017 school year shows multiple referrals for insubordination and physical aggression. If Student A was in fact physically aggressive and a danger to other students, and that information was known to the District, the failure to disseminate such information to his teachers may be willful and wanton. Knowledge of Student A's aggression and the lack of precautions to protect other students may demonstrate indifference or conscious disregard for students' safety. Genuine issues of fact exist on the question of whether defendants' conduct was willful and wanton. Thus, summary judgment was improper." *Id.*

¶ 25    Having held that summary judgment was improper on count I of the second amended complaint, the appellate court held that the trial court also erred in entering summary judgment on count II because count II was derivative of count I. *Id.* ¶ 34.

¶ 26    In dissent, Justice Hettel argued that the conduct alleged in the complaint was not willful and wanton as a matter of law, rendering the defendants immune from liability under section 3-108. *Id.* ¶¶ 40, 46 (Hettel, J., dissenting). Justice Hettel noted that courts in Illinois "have repeatedly held that allegations against school staff for inadequate supervision are insufficient as a matter of law to establish willful and wanton conduct." *Id.* ¶ 42 (citing 25 cases). He argued, "[w]hile the disputed facts may raise an issue as to whether Dayhoff was guilty of negligence, they are insufficient to establish willful and wanton conduct." *Id.* ¶ 44. In sum, the undisputed evidence failed to establish "that Dayhoff 'was aware or should have known that the absence of supervision posed a high probability of serious harm or an unreasonable risk of harm' [citation] to Riley on the day of the incident." *Id.* ¶ 45 (quoting *Jackson v. Chicago Board of Education*, 192 Ill. App. 3d 1093, 1100 (1989)).

¶ 27    This court granted the defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Dec. 7, 2023). We allowed the Illinois Association of School Boards and the Park District Risk Management Agency to file briefs as *amici curiae* on behalf of the defendants' position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). We also allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief on behalf of the plaintiffs' position. *Id.*

ANALYSIS

¶ 29 At issue is whether the trial court erred in entering summary judgment in favor of the defendants based on sections 3-108, 2-109, and 2-201 of the Tort Immunity Act. Summary judgment may be granted where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of any material fact and the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Pielet v. Pielet*, 2012 IL 112064, ¶ 29. A genuine issue of material fact exists where the material facts are disputed or reasonable people could draw different inferences from the undisputed material facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. This court will construe the record strictly against the movant and liberally in favor of the nonmoving party. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25. Disposing of litigation on a motion for summary judgment is a "drastic measure"; as such, a motion "should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. We review the circuit court's ruling on a motion for summary judgment *de novo*. *Id.*

¶ 30 The Illinois legislature enacted the Tort Immunity Act in 1965 in response to a decision of this court that abolished sovereign immunity for local governmental entities. *Andrews v. Metropolitan Water Reclamation District of Greater Chicago*, 2019 IL 124283, ¶ 23 (citing *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 24-25 (1959), and *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 43 (1998)). "The Tort Immunity Act governs whether and under what circumstances local governmental entities are immune from liability in civil actions." *Id.* "Unless a specific immunity provision applies, a public entity is liable in tort to the same extent as a private party." *Id.* The burden is on the public entity or employee to prove its immunity under the Act, which "must be construed strictly against the public entity seeking immunity." *Id.*

¶ 31 Section 3-108 of the Tort Immunity Act immunizes a local public entity or public employee for negligent supervision of, or negligent failure to supervise, an activity on public property. 745 ILCS 10/3-108 (West 2016).

¶ 32 Section 3-108 states:

"(a) Except as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury.

(b) Except as otherwise provided in this Act, neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property unless the employee or the local public entity has a duty to provide supervision imposed by common law, statute, ordinance, code or regulation and the local public entity or public employee is guilty of willful and wanton conduct in its failure to provide supervision proximately causing such injury." *Id.*

¶ 33 Willful and wanton conduct is an express exception to the immunities set forth in section 3-108. The Tort Immunity Act defines "willful and wanton conduct" as follows:

" 'Willful and wanton conduct' as used in this Act means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. This definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." *Id.* § 1-210.

¶ 34 Generally, the issue of whether a defendant's conduct is willful and wanton is a question of fact for the jury. *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 27; *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 245 (2007). However, a court may decide the issue as a matter of law on summary judgment if the undisputed material facts, viewed in the light most favorable to the nonmoving party, are insufficient to sustain an allegation of willful and wanton conduct. See *Barr v. Cunningham*, 2017 IL 120751, ¶ 15; *Murray*, 224 Ill. 2d at 245; *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385 (1996).

¶ 35 In this court, the plaintiffs argue that the defendants were not entitled to summary judgment under section 3-108 because there were disputed issues of material fact as to whether the defendants' conduct was willful and wanton. They

contend that one disputed issue is whether the District's failure to inform Dayhoff of Student A's history of fighting and physical aggression was willful and wanton. The appellate court majority agreed with this point. The majority held, "[i]f Student A was in fact physically aggressive and a danger to other students, and that information was known to the District, the failure to disseminate such information to his teachers may be willful and wanton." 2024 IL App (3d) 230369-U, ¶ 31. The problem with the plaintiffs' argument and the appellate court's holding is that the plaintiffs never pled that the District had a duty to inform teachers about Student A's history and that the District breached such a duty. Count I of the second amended complaint alleged only that the District, as Dayhoff's employer, was vicariously liable for Dayhoff's willful and wanton conduct under principles of *respondeat superior*. There were no allegations that the District was independently liable for its own willful and wanton conduct. See *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 231-32 (2000) (distinguishing claims sounding in *respondeat superior* from claims of "direct negligence" against a principal); see also *Vancura v. Katris*, 238 Ill. 2d 352, 375 (2010).

¶ 36    It is well established that a plaintiff is bound by the allegations in the complaint when arguing against a motion for summary judgment. See *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 36 ("A summary judgment motion is confined to the issues raised in the complaint, and a plaintiff may not raise new issues not pleaded in his complaint to support or defeat a motion for summary judgment." (citing *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 43)); see also *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 373 Ill. App. 3d 895, 900 (2007) ("The issues in controversy and the theories upon which recovery is sought are fixed in the complaint."). Accordingly, whether the District acted willfully and wantonly in failing to disseminate information about Student A's history to his teachers is not a genuine issue of material fact. Consequently, it cannot be the basis for defeating summary judgment in this case.

¶ 37    The plaintiffs also argue that whether Dayhoff "knew or should have known" about Student A's "history of physical aggression and fighting" are disputed issues of fact that preclude summary judgment on the issue of willful and wanton conduct. We disagree. First, whether Dayhoff knew about Student A's disciplinary history is not in dispute because the plaintiffs failed to refute Dayhoff's sworn deposition testimony on this point. "When a deposition is used in support of a motion or

response to a motion for summary judgment and is not contradicted by a counter-affidavit or deposition, the sworn testimony in the deposition must be accepted as true for purposes of the motion." *Cnota v. Palatine Area Football Ass'n*, 227 Ill. App. 3d 640, 652 (1992). If the nonmoving party fails to provide evidence to counter the evidence submitted by the moving party, the nonmoving party cannot rely on his pleadings alone to raise issues of material fact. *Purtill v. Hess*, 111 Ill. 2d 229, 240-41 (1986).

¶ 38     In their complaint, the plaintiffs alleged that "[a]t all relevant times, defendant, [Dayhoff], knew that one of the students in his class, 'STUDENT A,' had a history of physically violent behavior towards other students and required an increased amount of supervision for the benefit and safety of other students." In response to that allegation, Dayhoff testified in his deposition that he did not know that Student A had a history of physically violent behavior toward other students. Dayhoff testified that he had never received any communications from school administration or staff concerning Student A's history, and he had never searched or accessed Student A's disciplinary history in the school's computer system. Dayhoff also testified that he did not recall having any disciplinary problems with Student A throughout the school year, other than Student A sometimes "goofing around," not dressing for class, or not participating in class. The plaintiffs filed no counter-affidavit or deposition testimony to refute Dayhoff's sworn testimony that he did not know about Student A's history.[1]

¶ 39     Dayhoff's uncontradicted deposition testimony established that he was not aware of Student A's disciplinary history. Because the plaintiffs have not presented any evidence to refute Dayhoff's sworn deposition testimony and to support the allegation in their complaint that Dayhoff knew that Student A "had a history of

---

[1]Although the plaintiffs' brief cites e-mails that were sent to Student A's teachers, the e-mails do not establish that Dayhoff knew about Student A's history prior to March 13, 2017. In an e-mail dated August 26, 2016, the school counselor explained that Student A had participated in the "moving forward process" before the start of the school year. She described Student A's goals for the year regarding grades, homework, and "need[ing] to use the adults in the building when he becomes angry or has conflict with a peer." There were no references to Student A's history of physical aggression toward other students. The other e-mail cited by the plaintiffs is not relevant to the incident at issue, as it was dated January 17, 2018.

physically violent behavior towards other students and required an increased amount of supervision," it was proper for the trial court to find that Dayhoff was not aware of a history of physically violent behavior by Student A.

¶ 40    The plaintiffs also assert that there is a genuine issue of material fact as to whether Dayhoff "should have known" about Student A's history of physically violent behavior toward other students. No evidence in the record supports this assertion. To the contrary, Hensley, the school principal, testified that there was no policy requiring teachers to review or monitor the school computer system for a student's behavioral reports or disciplinary history. Walz, the assistant principal, testified that there was no school policy requiring a school administrator to inform teachers of a particular student's behavior or discipline. She also testified that she did not inform any school staff member that Student A had a history of physical aggression because she did not believe he was physically aggressive. In the absence of any contrary evidence, we reject the plaintiffs' contention that there is a genuine issue of material fact as to whether Dayhoff should have been aware of Student A's history. See *Cincinnati Insurance Co. v. Argubright*, 151 Ill. App. 3d 324, 329 (1986) (mere conclusions of fact unsupported by evidence cannot create a triable issue of fact to preclude summary judgment).

¶ 41    Having determined that there are no genuine issues of material fact, we turn to whether the defendants are entitled to a judgment as a matter of law on the issue of willful and wanton conduct. The facts show that during the gym class on March 13, 2017, Student A was running in and out of the soccer game and pushing into other players while attempting to get the ball. Jacob testified that Student A was playing soccer aggressively and being "unnecessarily rough." He observed Student A pushing other students with his body and kicking the soccer ball "unnecessarily hard." He then saw Student A "hit Riley into the wall." Both Riley and Jacob testified that they saw Dayhoff sitting in a corner of the gym and looking at his laptop at various times during the class. Dayhoff testified that he did not see Student A engaging in aggressive behavior or initiating unwanted physical conduct with other students. He recalled that Student A was "playing soccer just like the rest of them." Dayhoff described the incident that resulted in Riley being injured as "three or four kids battling for the ball" and "a normal scrum for a soccer ball." Riley testified that he had no prior problems with Student A and that he did not think Student A "personally targeted" him. Dayhoff testified that he did not have any

- 14 -

disciplinary problems with Student A throughout the school year, other than Student A sometimes "goofing around," not dressing for class, or not participating in class.

¶ 42       Unlike other cases where courts found evidence of willful and wanton conduct based on the activity at issue, there is no evidence in the record in this case that playing indoor soccer is an inherently dangerous activity. Compare *Murray*, 224 Ill. 2d at 246 (allowing students to use a mini-trampoline without following safety guidelines was "well known" to be associated with a risk of spinal cord injuries), and *Hadley v. Witt Unit School District 66*, 123 Ill. App. 3d 19, 20, 23 (1984) (teacher in industrial arts class failed to act when he saw students engaged in the "dangerous activity" of hammering a piece of scrap metal through a hole in an anvil), with *Barr*, 2017 IL 120751, ¶ 23 ("no evidence presented at trial that floor hockey played with plastic hockey sticks and squishy balls is an obviously dangerous activity").

¶ 43       This record also lacks evidence that Dayhoff's failure to supervise the students playing soccer posed a specific threat of injuries to Riley. Compare *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 22, 29 (2004) (finding evidence of willful and wanton conduct, where students were left unsupervised on a school bus and a student was sexually assaulted by another student who "had a deviant sexual history" and was the subject of a protective plan requiring that he never be left unsupervised with other children), and *Gammon v. Edwardsville Community Unit School District No. 7*, 82 Ill. App. 3d 586, 589-90 (1980) (finding evidence of willful and wanton conduct where a guidance counselor dismissed the plaintiff and another student from her office following a confrontation, although the counselor was previously warned of the offender's threats to the plaintiff, and the offender then punched the plaintiff in the eye), with *Jackson*, 192 Ill. App. 3d at 1100 (no evidence of willful and wanton conduct where a teacher left a class unsupervised for 20 minutes and a student threw a chalkboard clip that struck and injured another student).

¶ 44       In this case, the plaintiffs alleged that Dayhoff should have paid attention to the students playing soccer instead of looking at his laptop. They alleged that, if Dayhoff had properly supervised the students, he would have seen Student A acting aggressively and removed him from the soccer game, which would have prevented

- 15 -

Riley from being injured. Construing the pleadings and evidentiary materials in the light most favorable to the plaintiffs, we find that the facts support a claim of negligent failure to supervise an activity on public property, for which section 3-108 provides immunity, but they do not rise to the level of willful and wanton conduct as set forth in the Tort Immunity Act.

¶ 45    The legislature provided a specific definition of "willful and wanton conduct" in the Act, "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property," and stated that "[t]his definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." 745 ILCS 10/1-210 (West 2016). "The language of section 1-210 is clear and unambiguous." *Murray*, 224 Ill. 2d at 235. This court must follow the statute as written by the legislature and may not rewrite it to obtain a particular result. See *People v. Garner*, 147 Ill. 2d 467, 475-76 (1992). We acknowledge that, in an ideal school situation, it is reasonable to expect teachers, such as Dayhoff, to be attentive to their students when they are participating in physical activities during gym class. Dayhoff clearly was not. However, the legislature unambiguously intended to immunize Illinois school districts from liability for the type of negligent conduct alleged in this case. The undisputed material facts, as set forth above, fall short of establishing either intentional conduct or an "utter indifference to or conscious disregard for the safety of others," as a matter of law, as would be required for a finding of willful and wanton conduct by Dayhoff. See 745 ILCS 10/1-210 (West 2016).

¶ 46    On this record, we conclude that the defendants established they were immune from liability under section 3-108 of the Tort Immunity Act and, thus, were entitled to summary judgment. Because we have found that section 3-108 applies, we need not address whether sections 2-109 and 2-201 of the Tort Immunity Act also apply to shield the defendants from liability. Furthermore, the circuit court correctly determined that the defendants were entitled to summary judgment on count II of the second amended complaint because count II is dependent on the defendants' liability under count I.

¶ 47                                    CONCLUSION

¶ 48        For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court of Kankakee County granting summary judgment in favor of the defendants.

¶ 49        Appellate court judgment reversed.

¶ 50        Circuit court judgment affirmed.